# IN THE UNITED STATES COURT OF FEDERAL CLAIMS
No. 11-659C
(Classified Opinion and Order Filed: August 21, 2012)
(Reissued: October 16, 2012)[1]
(Bid Protest)

| | |
|---|---|
| ************************************** | Post-award Bid Protest; |
| ETTEFAQ-MELIAT-HAI-AFGHAN CONSULTING, INC., | Responsibility Determination; Corrective Action; Ineligibility under Vendor Vetting Program; Apparent Successful Offeror. |
| Plaintiff, | |
| v. | |
| THE UNITED STATES, | |
| Defendant. | |
| ************************************** | |

David S. Cohen, Cohen Mohr, L.L.P., 1055 Thomas Jefferson St., N.W., Suite 504, Washington, D.C. 20007, for Plaintiff. John J. O'Brien and Gabriel E. Kennon, Cohen Mohr, L.L.P., and Catherine Donnelly, Ettefaq-Meliat-Hai-Afghan Consulting, Inc., of Counsel.

Tony West, Jeanne Davidson, Kirk Manhardt, and K. Elizabeth Witwer, Commercial Litigation Branch, Civil Division, United States Department of Justice, for Defendant. Scott N. Flesch and Mark Ries, United States Army Contract and Fiscal Law Division, of Counsel.

---

## OPINION AND ORDER

---

**WILLIAMS**, Judge.

In this post-award bid protest, Ettefaq-Meliat-Hai-Afghan Consulting, Inc., ("EMA") challenges the awards of multiple contracts by the Department of the Army, CENTCOM

---

[1] This opinion was issued as a classified opinion and order on August 21, 2012. On October 12, 2012, the parties filed a Joint Notice Regarding Redactions to the Court's Classified Opinion and Order Dated August 21, 2012, proposing a public version. The Court publishes this opinion adopting the redactions proposed by the parties.

Contracting Command ("Army") for trucking services in the Afghanistan Theater of Operations.[2] The Army disqualified EMA from receiving an award on the ground that EMA was nonresponsible, a determination EMA seeks to overturn as arbitrary and capricious. EMA also claims that the Army misapplied the Government's "vendor vetting" program, a classified contractor rating process designed to ensure the reliability of military contractors in Iraq and Afghanistan. Specifically, EMA contends that the Army failed to properly debrief EMA, preventing EMA from seeking reconsideration of its [                              ] which rendered EMA ineligible to receive any United States Government contracts in Afghanistan, including the subject award. EMA seeks a permanent injunction remanding the responsibility determination to the Army. At oral argument, EMA sought additional relief in the form of a new debriefing with a directive to the contracting officer to advise EMA of its right to request reconsideration of its vendor vetting rating.

This matter comes before the Court on the parties' cross-motions for judgment on the administrative record ("AR") and EMA's motion for a permanent injunction. Upon consideration of the AR, the motion papers, and all classified appendices, the Court concludes that EMA has failed to demonstrate that either EMA's nonresponsibility determination or the vendor vetting process was improper. The Court therefore grants Defendant's motion for judgment on the administrative record and denies Plaintiff's motion for a permanent injunction.

## Findings of Fact[3]

### The Solicitation

On February 22, 2011, the Army issued solicitation number W91B4N-11-R-5000 for National Afghan Trucking ("NAT") services in Afghanistan. The purpose of the NAT contract was to provide a secure and reliable means of distributing reconstruction material, security equipment, fuel, miscellaneous dry cargo, and life support assets to forward operating bases and distribution sites throughout the combined joint operations area in Afghanistan. The Army anticipated the award of indefinite delivery/indefinite quantity contracts for trucking services in three suites: Suite 1 for bulk fuel, Suite 2 for dry cargo, and Suite 3 for heavy cargo. AR 30. The NAT procurement was essentially a follow-on procurement to the Host Nation Trucking ("HNT") contract, which had involved substantially the same mission requirements.

The solicitation stated that the Army would make awards based on Federal Acquisition Regulation ("FAR") 15.101-2, "lowest price technically acceptable."[4] Proposals were to be

---

[2] CENTCOM is a "Unified Combatant Command, directly under the Secretary of Defense, that assists nations, primarily in the Middle East, to combat terrorism, establish secure environments, and foster regional stability." Def.'s Cross-Mot. for J. on the Admin. Record 1 n.1.

[3] The findings of fact are derived from both the unclassified and classified portions of the AR. Citations to "EMA" or "REF" are citations to the classified portion of the record. Findings of fact relating to the vendor vetting program in Afghanistan are included in the discussion.

2

evaluated using two criteria: technical capability and price. AR 184. The solicitation stated that "the Government will evaluate the offeror for responsibility in accordance with FAR 9.1." AR 187. FAR 9.104-1 provides:

To be determined responsible, a prospective contractor must--

(a) Have adequate financial resources to perform the contract, or the ability to obtain them (see 9.104-3(a));

(b) Be able to comply with the required or proposed delivery or performance schedule, taking into consideration all existing commercial and governmental business commitments;

(c) Have a satisfactory performance record (see 48 CFR 9.104-3(b) and part 42, subpart 42.15). A prospective contractor shall not be determined responsible or nonresponsible solely on the basis of a lack of relevant performance history, except as provided in 9.104-2;

(d) Have a satisfactory record of integrity and business ethics (for example, see Subpart 42.15).

(e) Have the necessary organization, experience, accounting and operational controls, and technical skills, or the ability to obtain them (including, as appropriate, such elements as production control procedures, property control systems, quality assurance measures, and safety programs applicable to materials to be produced or services to be performed by the prospective contractor and subcontractors) (see 9.104-3(a));

(f) Have the necessary production, construction, and technical equipment and facilities, or the ability to obtain them (see 9.104-3(a)); and

(g) Be otherwise qualified and eligible to receive an award under applicable laws and regulations . . . .

**Submission of Proposals**

Although EMA was an incumbent HNT contractor as a member of a joint venture with Mesopotamia Group ("MG") known as MG EMA, EMA bid on the NAT procurement alone, and independently of MG. EMA timely submitted its proposal for all three NAT suites. See AR 2182. On July 29, 2011, the Army eliminated all bidders for the NAT procurement whose proposals failed either the technical or price requirements, and forwarded the remaining proposals for determinations of responsibility. AR Tabs 107.1-107.3. By letter dated July 31, 2011, the contracting officer informed EMA that its responsibility evaluation was ongoing and listed several areas of concern, requesting that EMA provide responses including the

---

[4] All references to the FAR are to Title 48 of the Code of Federal Regulations as codified at the time of EMA's responsibility determination on August 9, 2011.

3

circumstances giving rise to each area of concern, any mitigating circumstances, and the corrective action taken to prevent reoccurrence. AR 16236-39. Adverse information relating to EMA's performance of the HNT contract involved non-compliance with In-transit Visibility ("ITV") contract requirements, failure to meet Private Security Contractor Arming Requirements, forged Transportation Movement Requests ("TMRs"), and withholding of contract payments for multiple failed missions, cancelled no pay missions, pilferage/backcharges, and fuel backcharges. Id. In describing this adverse information, the contracting officer cited letters of concern dated December 22, 2009, February 1, 2010, and August 31, 2011, and cure notices dated January 1, 2010, and July 5, 2011, issued to EMA under the HNT contract. Id. On August 2, 2011, EMA responded, detailing the relevant circumstances, mitigating factors, and corrective action taken. EMA 56.

**The Nonresponsibility Determination**

The contracting officer found that EMA was nonresponsible on August 9, 2011, relying entirely on EMA's performance of the HNT contract as part of the MG EMA joint venture. Before addressing any specific provisions of FAR 9.104-1 in her responsibility determination, the contracting officer noted that although EMA's performance issues under the HNT contract arose during its joint venture with MG, the responsibility determination for the NAT award would refer to "MG EMA" as "EMA." EMA 2. In the remainder of the responsibility determination, the contracting officer attributed performance failures of "MG EMA" under the HNT contract to "EMA."[5]

**EMA's Inability to Meet the Delivery or Performance Schedule**

Applying the individual sections of FAR 9.104-1, the contracting officer first determined that EMA did not meet the requirements of FAR 9.104-1(b), which provides that the prospective contractor must "[b]e able to comply with the required or proposed delivery or performance schedule, taking into consideration all existing commercial and governmental business commitments." The contracting officer stated:

> There is evidence that EMA's repeated failure to comply with the terms and conditions of [the HNT contract] inhibited compliance with the required delivery and performance requirements when performing Host Nation Trucking (HNT) in Afghanistan. Specifically, a Cure Notice issued regarding failure to provide deliverables (including arming requirements), dated 1 Jan 2010 and the Letter of Concern issued for failure to meet Private Security Contractor Arming Requirements, dated 1 Feb 2010. These events demonstrate a systemic trend in failing to comply with significant contract requirements which include critical areas of security and safety which directly impact compliance with required schedule and performance requirements. Contractors under the HNT contract cannot perform individual transportation missions unless compliance with arming

---

[5] EMA has not challenged the contracting officer's reference to "MG EMA" as "EMA." Some of the contracting officer's references to EMA apply exclusively to EMA and not the MG EMA joint venture. E.g., [                                                                                         ]

4

and associated training requirements and utilization of authorized PSC firms are demonstrated. EMA's history of non-compliance with submission of deliverables, inability to properly manage its employees and subcontractors, including the Private Security Contractor, and its failure to implement effective corrective action which prevented reoccurrence do not support a determination that EMA will be able to comply with the required delivery and performance requirements under the NAT requirement.

EMA 3-4.

### EMA's Lack of a Satisfactory Performance Record

The contracting officer also found that EMA did not satisfy the requirements of FAR 9.104-1(c), which requires that the prospective contractor "[h]ave a satisfactory performance record . . . ." The contracting officer stated:

> Review of the [areas of concern] indicates a systemic problem with EMA adhering to the material provisions of the contract, thus resulting in significant doubt that [EMA] can perform the services required without a high degree of risk passed to the US Government. EMA failed to comply with the requirements of the Statement of Work (SOW) of the [HNT contract] on several occasions. At a minimum, and after being notified on at least two (2) occasions, EMA failed to comply with the Private Security Contractor Arming requirements, particularly, non-compliance with providing correct and complete armed employee authorization packages and registration in the Synchronized Predeployment Operational Tracker (SPOT) database.
>
> . . .
>
> Multiple failures to comply with the HNT SOW requirements led to millions of dollars being withheld for a combination of failed missions, canceled-no pay missions, pilferage/back charges and fuel back charges . . . throughout the period of performance of its current trucking contract. The cancelled missions due to failure to comply with the SOW requirements exposed Afghan and American Service members to unnecessary risk. EMA has demonstrated current ongoing systemic failures in meeting the terms and conditions of the HNT contract.

EMA 4.

### EMA's Lack of a Satisfactory Record of Integrity and Business Ethics

Additionally, the contracting officer found that, for several reasons, EMA did not satisfy FAR 9.104-1(d)'s requirement that the prospective contractor "[h]ave a satisfactory record of integrity and business ethics." First, the contracting officer found that a number of "events" evidenced EMA's "systemic pattern of fraudulent behavior and activity," specifically a failure to establish proper internal controls ensuring compliance with ITV requirements, a "systematic

5

pattern of failed missions," reoccurring instances of forged TMRs, and the July 13, 2011 referral of EMA for debarment because of such forgery. EMA 4-5.

Second, the contracting officer noted that [

] The contracting officer also noted that [
] The contracting officer stated:

[




] the existence of the issues identified herein further substantiate EMA's inability to maintain integrity and business ethics while performing transportation services in the Afghanistan area of operations, an area rife with bribery, corruption, and criminal activity.

EMA 5-6.

Third, the contracting officer found EMA nonresponsible under FAR 9.104-1(d) due to reports that an EMA employee attempted to access a military facility with false identification. EMA 6, 87-88. The NAT contracting officer concluded that the "unethical decision to allow unauthorized access to U.S. identification media increases the force protection risk to U.S. and Coalition forces." EMA 6.

### EMA's Lack of Necessary Organization, Experience, Accounting and Operational Controls and Technical Skills, and Lack of Qualifications and Eligibility under Applicable Laws

The contracting officer found that EMA was nonresponsible under FAR 9.104-1(e), requiring that a bidder possess necessary controls and technical skills, because, in addition to the reasons stated under FAR 9.104-1(b) and FAR 9.104-1(c), EMA had received cure notices in January, 2010, and July, 2011, for its failure to improve Global Distribution Management System utilization rates, failure to comply with Defense Base Act ("DBA") insurance coverage requirements, and for refusing certain missions. EMA 7. Finally, the contracting officer found

that EMA was not qualified or eligible to receive award under applicable laws and regulations as required by FAR 9.104-1(g), because EMA was "ineligible for award" as a result of the vendor vetting process. EMA 7.

In making her final determination, the contracting officer found that EMA had been seriously deficient in contract performance of the HNT contract, stating:

> A review of the supporting documentation and EMA's response(s) substantiate the circumstances were not beyond the contractor's control and the record demonstrates that appropriate corrective action was not taken to prevent reoccurrence of the deficient performance. This past failure to apply sufficient tenacity and perseverance to perform acceptably is deemed sufficient evidence of EMA's non-responsibility under the NAT solicitation.

EMA 13-14.

## EMA's Debriefing and Protests

EMA requested a debriefing on August 11, 2011, and received a written debriefing the following day. AR 22581. EMA filed an agency-level bid protest on August 22, 2011, which was denied on August 23, 2011. AR 21304-39. EMA then filed a bid protest at the Government Accountability Office, but that protest was dismissed due to pending litigation regarding the NAT procurement in this Court. On October 12, 2011, EMA filed its complaint in this Court.

## Discussion

### Jurisdiction and Standard of Review

The Court has jurisdiction over this bid protest pursuant to the Tucker Act, 28 U.S.C. § 1491(b)(1) (2011). In a bid protest, the Court reviews an agency's procurement decision under the standards enunciated in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706 (2011). 28 U.S.C. § 1491(b)(4); see also Ala. Aircraft Indus., Inc.-Birmingham v. United States, 586 F.3d 1372, 1373 (Fed. Cir. 2009). Pursuant to the APA, this Court may set aside an agency action that was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706 (2)(A); see also Ala. Aircraft Indus., 586 F.3d at 1373.

An agency action is arbitrary and capricious when the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Ceres Envtl. Servs., Inc. v. United States, 97 Fed. Cl. 277, 302 (2011) (citing Ala. Aircraft Indus., 586 F.3d at 1375)). An "agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choices made.'" In re Sang Su Lee, 277 F.3d 1338, 1344 (Fed. Cir. 2002) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)).

"Contracting officers are afforded considerable discretion in negotiated procurements, such as this one, where award is premised on a 'best value' determination." Ceres Envtl. Servs., Inc., 97 Fed. Cl. at 302 (citing Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1355 (Fed. Cir. 2004)). Importantly, "[c]ontracting officers are 'generally given wide discretion' in making responsibility determinations and in determining the amount of information that is required to make a responsibility determination." Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1334-35 (Fed. Cir. 2001) (quoting John C. Grimberg Co. v. United States, 185 F.3d 1297, 1303 (Fed. Cir. 1999)). See also News Printing Co. v. United States, 46 Fed. Cl. 740, 746 (2000) ("'A contracting agency has broad discretion in making responsibility determinations since it must bear the brunt of difficulties experienced in obtaining the required performance.'") (quoting In re House of Commc'ns & Graphics, B-245920, 1992 WL 55054, at *2 (Comp. Gen. 1992); In re Garten-und Landschaftsbau GmbH Frank Mohr, B-237277, 1990 WL 277689, at *2 (Comp. Gen. 1990). "When such decisions have a rational basis and are supported by the record, they will be upheld." Bender Shipbuilding & Repair Co. v. United States, 297 F.3d 1358, 1362 (Fed. Cir. 2002). Plaintiff has the burden of establishing that the responsibility determination was arbitrary and capricious. Impresa, 238 F.3d at 1337.

In resolving bid protests, the trial court is to make findings of fact weighing the evidence in the administrative record. See Bannum, Inc. v. United States, 404 F.3d 1346, 1355 (Fed. Cir. 2005). If the protestor succeeds in demonstrating an error in the procurement process, the Court then proceeds to determine, as a factual matter, whether the protestor was prejudiced by that error.

**The Army's Responsibility Determination was Reasonable**

EMA contends that the Army improperly found EMA nonresponsible under FAR 9.104(b)-(e) and 9.104(g). However, the AR and its classified annexes provide sufficient support for the contracting officer's decision. Under the FAR, when evaluating a prospective contractor for responsibility, a contracting officer "shall make a determination of nonresponsibility" if there is an "absence of information clearly indicating that the prospective contractor is responsible." FAR 9.103(b) (emphasis added). The onus is on the contractor to prove to the agency that it is presently responsible. OSG Prod. Tankers LLC v. United States, 82 Fed. Cl. 570, 576 (2008) (citing FAR 9.104-3(c)). Thus, under FAR 9.103(b), the contracting officer is required to make a nonresponsibility determination unless sufficient information "clearly" indicates that the contractor is responsible. In this case, the record as a whole does not support a conclusion that EMA provided "information clearly indicating" that EMA was responsible.

The contracting officer reasoned that EMA lacked integrity and business ethics as required by FAR 9.104-1(d) because, according to a report prepared by CJ2X, a military intelligence unit, [

                                 ] The contracting officer stated:

[

        ] the existence of the issues identified herein further substantiate EMA's inability to maintain integrity and business ethics while performing transportation services in the Afghanistan area of operations, an area rife with bribery, corruption, and criminal activity.

EMA 5-6.

    This Court recognizes that CJ2X also concluded that [

        ] EMA claims that [
                ] the contracting officer's reliance on the CJ2X report was irrational. EMA overlooks the contracting officer's conclusion that [

                                                                     ]
EMA does not contest that [
        ] EMA does not contest that [

    ] support the contracting officer's conclusion that EMA lacked business ethics and integrity.[6]

    In another conclusion under FAR 9.104-1(d), the contracting officer found that EMA lacked integrity and business ethics because, [                ] on August 5, 2011, an Afghan national attempted to gain unauthorized access to a military base with fraudulent identification he claimed was provided by EMA. EMA 87-88. In addition, the

---

    [6] The contracting officer also found that EMA lacked business ethics and integrity because [

        ] Although the contracting officer erred by relying on [        ] when making her nonresponsibility determination, this error was nonprejudicial. EMA's record of failed missions, [        ] forgery, misuse of identification, and inadequate ITV use provided ample support for the contracting officer's conclusion that EMA was nonresponsible.

Afghan national indicated that EMA regularly provided false identification to EMA's employees. Id. at 88. EMA argues that a single documented instance of attempted base access is insufficient to justify a finding that EMA lacked integrity and business ethics. However, this type of assessment is a quintessential business judgment, and this Court will not second guess the contracting officer's judgment where there is supporting evidence. See Bender Shipbuilding & Repair Co., 297 F.3d at 1362 (Fed. Cir. 2002); News Printing Co., 46 Fed. Cl. at 746. The contracting officer reasonably concluded that this instance of providing fraudulent identification to circumvent military security indicated a lack of integrity and business ethics.

EMA further argues that the contacting officer's reliance on this intelligence report was misplaced because the Government [                                                                              ] Plaintiff has not provided evidence that calls into question the intelligence report beyond simply repeating [                                        ] -- and has not articulated why such a report deserves to be discounted. As the Comptroller General has recognized, information in investigative reports may be used as the basis of a nonresponsibility determination. In re Frank Cain & Sons, Inc., B-236893, 1990 WL 277550, at *2 (Comp. Gen. 1990). Attacking only the label of military intelligence -- without challenging its sources or substance -- is an insufficient basis for overturning the contracting officer's reliance on the report. Cf. Latif v. Obama, 666 F.3d 746, 750 (D.C. Cir. 2011) (noting that "courts have no special expertise in evaluating the nature and reliability of the Executive branch's wartime records").

The contracting officer also concluded that EMA was nonresponsible because the Government withheld "millions of dollars" from EMA under the HNT contract "for a combination of failed missions, cancelled no pay missions, pilferage/backcharges and fuel backcharges." EMA 5. The contracting officer found that these withholdings totaled $23,200,686.62, attributing $6,051,042.62 "to EMA's performance failures." EMA 5. EMA contends that funds totaling roughly $17 million were withheld not because of any fault on EMA's part but because the Government cancelled missions. EMA concedes performance failures that the Government estimates resulted in over $2 million in withheld funds. Pl.'s Mot. 17-18; AR 16244, 16275, 16315, 16323, 16344.

While the dollar amount associated with missions cancelled for the government's convenience should not have been held against EMA, it is not contested that sums were properly withheld due to EMA's own performance failures including forgery, failed missions, pilferage, and fuel backcharges. EMA does not contest that these failures occurred, only the amount that should have been withheld. Whether the withheld amounts attributable to EMA's nonperformance should have been closer to $2 million or to $6 million, the withholdings were substantial and provided a reasonable ground for the contracting officer's nonresponsibility finding.

EMA also had a record of substandard ITV use -- the requirement that carriers install satellite-based tracking devices on cargo trucks -- that raised serious doubts as to its reliability to perform in a warzone. The HNT statement of work required that "[a]ll vehicles used in support of HNT missions must have [an ITV] device . . . ." AR 21273. The Government issued a letter of concern on December 22, 2009, indicating that EMA's use of ITV devices had fallen to seven

10

percent in the previous four weeks. AR 16244. Over a year later, ITV use remained a significant problem. In a July 5, 2011 cure notice, the Army noted that EMA's ITV use was 56 percent between April 1, 2010 and April 1, 2011. EMA 32. EMA does not contest this pattern of ITV use, and the contracting officer's reliance on EMA's lengthy record of ITV nonuse to conclude EMA lacked the requisite business ethics was reasonable.

As with its record of ITV use, EMA does not deny that its drivers forged TMRs. AR 16276 ("[EMA] agree[s] that there have been approximately 20+ mission sheets discovered forged during the HNT contract."); 16273 (explaining that "drivers . . . attempted to white out . . . details on the mission sheet"). Instead, EMA classifies the instances of forgery as "relatively small." Pl.'s Mot. for J. on the AR ("Pl.'s Mot.") 18. It was within the contracting officer's discretion, however, to determine to what extent admitted instances of fraud indicated a lack of integrity and business ethics. John C. Grimberg Co., 185 F.3d at 1303 ("Because responsibility decisions are largely a matter of judgment, contracting officers are generally given wide discretion to make this decision.").

In short, the contracting officer reasonably concluded that EMA's record of forgery, mission failure, unsatisfactory ITV use, inability to control its identification credentials, and [              ] raised significant doubts regarding EMA's integrity and business ethics. Those findings were sufficient to justify the contracting officer's conclusion that EMA was nonresponsible. EMA's arguments that instances of forgery were "relatively small" or that it had [                              ] do not alter the evidence that such misconduct occurred.[7]

In any event, a review of EMA's performance on the HNT contract as a whole reveals not that EMA was responsible for only minor, isolated incidents of nonperformance, but that EMA exhibited serious deficiencies and a pattern of noncompliance which combined to raise serious doubts about EMA's ability to perform the NAT contract. See In re Frank Cain & Sons, Inc., 1990 WL 277550, at *2. Thus, the contracting officer's determination was reasonable not only because she cited a variety of serious failures under the HNT contract, but because "the

---

[7] EMA claims that the contracting officer's failure to consider the extent of the problems that she described is a violation of FAR 9.104-3(b). That section of the FAR requires that "[a] prospective contractor that is or recently has been seriously deficient in contract performance shall be presumed to be nonresponsible," and adds that "[t]he contracting officer shall consider the number of [prior] contracts . . . and the extent of deficient performance in each contract" when making her responsibility determination. EMA argues that the contracting officer violated FAR 9.104-3(b) by not quantifying EMA's failures relative to its total number of successful missions. However, FAR 9.104-3(b) does not require that a contracting officer find an offeror responsible when its performance of a prior contract was "mostly" or "largely" acceptable -- it presumes a contractor with seriously deficient performance to be nonresponsible. The FAR imposes requirements for <u>establishing</u> affirmative responsibility on the contractor. OSG Prod. Tankers, 82 Fed. Cl. at 576. It does not mandate acceptance of some unspoken degree of nonperformance or require the contracting officer to measure nonperformance with an artificial yardstick. Rather, the FAR entrusts the contracting officer with making a business judgment in assessing whether a prospective contractor has the wherewithal to perform.

cumulative effect" of EMA's deficiencies -- including minor deficiencies -- would "unduly . . . increase the burden of administration from the Government's standpoint." To the Sec'y of the Army, B-151121, 1963 WL 2036, at *6 (Comp. Gen. 1963).

The Court reaches this conclusion despite the fact that the contracting officer occasionally overstated EMA's record of nonperformance on the HNT contract or failed to articulate precise connections between the record evidence and her conclusions. For instance, the contracting officer relied on EMA's alleged failure to meet PSC arming requirements to find that EMA could not comply with the proposed schedule under FAR 9.104-1(b), that EMA lacked a satisfactory performance record under FAR 9.104-1(c), and that EMA lacked the necessary organization and experience under FAR 9.104-1(e). The record, however, is unclear as to whether EMA actually failed to comply with the PSC arming requirements. So too, the contracting officer provided no explanation why EMA's ITV use, failure to comply with DBA insurance requirements, and refusal to accept missions were "indicative of a lack of quality assurance and operational control" under FAR 9.104-1(e). EMA 7; see AR 16359 ("[t]here were admittedly a few delays in getting the new [insurance] policy in place"); Pl's Mot. 9 (noting that EMA refused to undertake missions to "two or three" locations).

Nonetheless, the FAR does not require that each of the contracting officer's conclusions be independently sufficient on its own to support a finding of nonresponsibility. Rather, the contracting officer's nonresponsibility determination as a whole must be rational. See To the Sec'y of the Army, 1963 WL 2036, at *6. Even acknowledging those instances where the contracting officer was imprecise, unclear, or overemphasized instances of EMA's nonperformance, the findings in the nonresponsibility determination as a whole regarding EMA's experience under the HNT contract provide a reasonable basis for the judgment that EMA lacked the requisite business integrity, ethics, and perseverance to perform the NAT contract. EMA admitted that its drivers forged TMRs and that [
                    ] that it failed to use ITV devices in quantities required, and that EMA was responsible for pilferage and fuel backcharges. AR 16273, 16276, 16281, 16315; Pl.'s Classified App. 1-2. EMA's cumulative failures provided ample basis for the contracting officer to find EMA nonresponsible.

**The Contracting Officer's Consideration of EMA's Corrective Action**

EMA concedes that it did not meet certain requirements of the HNT contract, but argues that the contracting officer did not credit EMA's subsequent corrective actions. EMA's argument fails because the contracting officer's consideration of EMA's documented record of nonperformance was not arbitrary or capricious, even though EMA had undertaken corrective action. See Stapp Towing Inc. v. United States, 34 Fed. Cl. 300, 309-10 (1995) (upholding Small Business Administration's refusal to issue a certificate of competency to contractor with an unsatisfactory safety record, despite contractor's ongoing corrective action); Reel-O-Matic Sys., Inc. v. United States, 16 Cl. Ct. 93, 99-101 (1989) (upholding Small Business Administration's refusal to issue a certificate of competency to contractor with an unsatisfactory record on a contract identical to that at issue, despite contractor's attempts to increase capacity and improve quality assurance). Although EMA instituted corrective action in response to the Army's concerns -- and although the Army approved of that action for purposes of allowing

EMA to continue performing the HNT contract -- the fact remains, as EMA concedes, that EMA had significant lapses in required performance. The Army's continuing use of EMA for the HNT contract -- an emergency wartime contract -- did not hamstring its ability to make a different business judgment when evaluating EMA's responsibility for a second, independent award. See In re MCI Constructors, Inc., B-240655, 1990 WL 293560, at *3 (Comp. Gen. 1990) ("A nonresponsibility determination may be based upon the contracting agency's reasonable perception of inadequate prior performance, even where the agency did not terminate the prior contract for default . . . .") (citation omitted).

Nor are any HNT performance problems irrelevant because, as EMA claims, they began two years prior to the responsibility determination and were too remote. FAR 9.104-1(d) requires that a prospective contractor have a satisfactory record of performance and business ethics without specifying its duration. The NAT solicitation noted that "[a] prospective contractor that is or recently has been seriously deficient in contract performance shall be presumed to be nonresponsible." AR 36 (emphasis added). EMA's nonperformance of the HNT contract, beginning two years prior to the contracting officer's responsibility determination and continuing through the summer of 2011, was relevant. See, e.g., AR 16356 (July 5, 2011 cure notice); see also Reel-O-Matic, 16 Cl. Ct. at 96 (upholding Small Business Administration's refusal to issue certificate of competency after considering adverse past performance occurring roughly five years prior); MCI Constructors, Inc., 1990 WL 293560, at *3 ("As to whether [a default] termination is still entitled to consideration [for purposes of a responsibility determination] after 2 years . . . performance under older but still relatively recent similar contracts is not irrelevant, especially where, as here, more recent performance is mixed.") (citation omitted).

**Mitigating Circumstances**

EMA also argues that the Army's nonresponsibility determination was arbitrary and capricious because the contracting officer failed to properly consider mitigating circumstances. EMA claims that the Army's own policies were partly to blame for EMA's nonperformance. EMA argues that, as of 2009, the Army "failed to permit delivery trucks on site, failed to create verification procedures for mission sheets, failed to verify downloads, and lost documents demonstrating EMA's compliance with the HNT contract." Pl.'s Mot. 32. EMA also points to its January 7, 2011 correspondence with the Army, in which it suggests that some instances of "pilferage" might have been cases of inadequate government record keeping. EMA's imprecise allegations of government practices cannot excuse its own performance problems under the HNT contract. EMA has not articulated a connection between the Government's conduct and its record of nonperformance that would cast doubt on the contracting officer's determination that EMA had a track record of varied performance failures.

### EMA's Ineligibility for Award Under the Vendor Vetting Program

Prior to award of the NAT contract, the military implemented a classified "vendor vetting" program designed to ensure the reliability of government contractors in Afghanistan and Iraq. As a result of this process, EMA was determined to be ineligible for award. EMA claims

that the Army failed to follow the vendor vetting procedures, and that this failure resulted in EMA's unwarranted disqualification under the vetting program.

**<u>The Vendor Vetting Program in Afghanistan</u>**

On November 5, 2010, CENTCOM Contracting Command issued an "Acquisition Instruction" governing acquisitions supporting operations in Afghanistan. REF 11. The Acquisition Instruction requires contracting officers to vet all non-U.S. vendors operating in Afghanistan as directed by Fragmented Order ("FRAGO") 10-330. REF 74. FRAGO 10-330 mandates the creation of a program to "vet prospective non-US vendors to prevent insurgents, terrorists, criminals, and militias from using contract proceeds to fund their operations" [

]

The vetting process is outlined both in the Acquisition Instruction and, primarily, in FRAGO 10-330. The process has several steps. First, a non-U.S. vendor registers with the Joint Contingency Contracting System ("JCCS") by submitting data regarding the vendor's location and identification. REF 74, 230. Second, the contracting officer submits all non-U.S. vendors for vetting by JCCS, a process which takes approximately 14 days. REF 75, 231.

[

]. A "rejected" vendor is ineligible to receive contract awards in Afghanistan. REF 231-33.

The FRAGO delineating the vendor vetting process contains the following sections:

[

]

…

[

14

]

[                                                                      ] a bidder is "rejected" does not necessarily mean that a contractor is ineligible for award at the time of rejection. [




                                                                      ] a contracting officer may not award contracts to the rejected vendor. REF 76, 233.

Under both the FRAGO and the Acquisition Instruction, notification of rejection is required only if the vendor would otherwise be the "apparent successful offeror," and the vendor requests a debriefing. REF 75-76. Even if an apparent successful offeror requests and receives a debriefing, the contracting officer may only inform it of the following, in writing:

> You were determined to be ineligible for award of subject contract by United States Forces – Afghanistan/Iraq. You may submit a written request for reconsideration of this determination to USFOR-A/USF-I, through the Contracting Officer, within 60 calendar days of this notification.

REF 76. The FRAGO mandates that rejected vendors "shall only be notified of their rejected status if there is a legal necessity to do so." REF 244. The Acquisition Instruction states that "[i]f an offeror is not the apparent successful offeror, follow normal procedures. **DO NOT MENTION THEIR INELIGIBILITY.**" REF 76.

[




]

**EMA's Vetting**

[
                                                      ] Under FRAGO 10-330, the requiring activity [
            ] permitting EMA to receive a NAT award. In accordance with the vendor vetting process, the contracting officer requested confirmation from the requiring activity [                                            ] On August 3, 2011, the requiring activity declined to [
      ] EMA 11. [
                                    ] EMA was, under the vendor vetting program, determined to be a "rejected" contractor for United States procurements in Afghanistan as of August 3, 2011. Id. The contracting officer [
        ] as a basis for her final determination of nonresponsibility. EMA 13.

EMA attempts to find fault with the Government's responsibility determination by alleging procedural infirmities with the Army's application of the vendor vetting requirements to EMA. Specifically, EMA argues that because it was a technically acceptable offeror with a reasonable price on the NAT procurement at the time it was determined to be "rejected" under the vendor vetting program, it was an "apparent successful offeror" and should have been advised of its right to reconsideration during its debriefing. [

]

EMA's argument hinges on its contention that it should have been deemed to be an "apparent successful offeror" within the meaning of the Acquisition Instruction when it was rejected under the vendor vetting program on August 3, 2011. The Acquisition Instruction requires:

> If, and only if, the rejected <u>apparent successful offeror</u> requests a debriefing, inform them of the following, in writing, after coordinating with CJA:
>
> "You were determined to be ineligible for award of subject contract by United States Forces – Afghanistan/Iraq. You may submit a written request for reconsideration of this determination to USFOR-A/USF-I, through the Contracting Officer, within 60 calendar days of this notification."

REF 76 (emphasis added). EMA claims that because it was "rejected" under the vendor vetting procedures on August 3, 2011, <u>before</u> its nonresponsibility determination on August 9, 2011, it remained an "apparent successful offeror," thus triggering the vendor-vetting requirement of a debriefing informing it of its right to seek reconsideration.

However, Plaintiff's characterization of itself as an "apparent successful offeror" at the conclusion of the vendor vetting process is not supported by the record or the chronology of events. The contracting officer's inquiry into Plaintiff's responsibility, which had raised several concerns, was well under way before the contracting officer determined that EMA was ineligible for an award under the vendor vetting procedures. Although CJ2X issued its report on July 25, 2011, [

]

On July 31, 2011, [                                                    ] the contracting officer notified EMA that it was then being evaluated for responsibility, listed seven areas of concern relating to EMA's performance, characterized these concerns as "adverse information which may impact the responsibility determination," and afforded EMA the opportunity to respond by August 2, 2011. AR 16236-39. The adverse information included forged mission sheets, noncompliance with ITV contract requirements, withholding of contract payments due to

16

failed or cancelled missions, and pilferage and fuel backcharges. <u>Id.</u> It was not until August 3, 2011, that the contracting officer learned that the requiring activity would [         ] for EMA. The responsibility determination indicated:

> In accordance with USFOR-A FRAGO 10-330, IJC FRAGO 606-2010, and the C-JTSCC (formerly C3) Acquisition Instruction, the Contracting Officer requested confirmation from the requiring activity on whether or not they intended to submit a request for exception to policy in relation to NAT. The requiring activity (Joint Sustainment Command-Afghanistan (JSC-A)) on 03 August 2011 declined to pursue an exception to policy. Therefore, the Contracting Officer <u>continued</u> evaluation for contractor responsibility in accordance with the solicitation.

EMA 11 (emphasis added).

Under these circumstances, it is not appropriate to make either a factual or legal finding that EMA was an "apparent successful offeror" as of August 3, 2011, when its vendor vetting rating was completed and it could have been debriefed. Rather, the responsibility assessment had begun and had unearthed unresolved "adverse information" including forgery, pilferage, and noncompliance concerning EMA's past performance which had yet to be fully considered by the contracting officer. AR 16236-39. EMA did not respond to this adverse information until August 2, 2011. EMA 56.

In creatively arguing that it was denied its rightful debriefing (and ensuing reconsideration and reinstatement of eligibility), Plaintiff is attempting to construct a bedrock principle for deeming contractors "apparent successful offerors" where none exits. Plaintiff urges that it was an apparent successful offeror in August 2011, because it had been determined to be technically acceptable with reasonable pricing as of July 29, 2011. Plaintiff ignores the fact that by July 31, its responsibility determination was proceeding apace, and the contracting officer had serious concerns. While it is true that often a technically acceptable offeror whose price is reasonable is described as an apparent successful offeror, such a description does not carry with it the type of definitive legal gravitas Plaintiff is trying to import here. Rather, this label of apparent successful offeror typically applies to an offeror who has satisfied all requirements for award at a given point in time. In the instant case, it is clear that Plaintiff was not an "apparent successful offeror" at the time that the vendor vetting process' debriefing and notice requirement would have attached. The earliest the contracting officer could have conducted a debriefing for EMA was August 3, 2011, after she learned that the requiring activity would [         ] At that point, however, EMA had yet to satisfy the requirements of the <u>already</u> ongoing responsibility determination. Indeed, the contracting officer had raised serious concerns about EMA's responsibility in her July 31, 2011 letter, requiring EMA's response to issues including forgery, fraud, millions of dollars in withheld funds, and failure to meet ITV requirements. With the outcome of the responsibility determination uncertain as of August 3, 2011, EMA had not fulfilled every requirement for which it was being evaluated, and was not an "apparent successful offeror" when the vendor vetting process terminated. Because EMA was not an "apparent successful offeror" at that time, the contracting officer was under no obligation to notify EMA that it had an opportunity to request reconsideration of its [
]

This interpretation of "apparent successful offeror" in the vendor vetting context is reflected in FRAGO 10-330, which requires that, after skipping a rejected vendor, the contracting officer award the contract to the next responsible and vetted vendor. REF 233. Specifically, the FRAGO provides: "**Skipping Rejected Vendors**: When a 'rejected' vendor has submitted a proposal and under the evaluation criteria a rejected vendor would be the apparent awardee of the contract, the contracting officer must skip the rejected vendor and award the contract to the next responsible and vetted vendor." Id. (emphasis added). Thus, in the context of the vendor vetting process itself, an "apparent successful offeror" is one found to be otherwise responsible.

For the first time during oral argument, counsel for Plaintiff requested new relief -- that the Court order another debriefing, instructing the contracting officer to advise EMA of its right to seek reconsideration during that debriefing. Tr. 64-65. Counsel argued that "based on the criteria set forth by the Army, the court is able to determine whether [EMA is] an apparently successful offeror or not, as that system is meant to work. . . . [T]he court can conclude that it is unreasonable, arbitrary, and capricious for the [contracting officer] not to have afforded the opportunity that EMA is requesting the Court to order on remand." Tr. 54-55.

The Administrative Dispute Resolution Act grants this Court jurisdiction to render judgment on an action objecting to "any alleged violation of statute or regulation in connection with a procurement." 28 U.S.C § 1491(b)(1). The Court possesses jurisdiction to provide Plaintiff's newly requested relief -- another debriefing -- since the vendor-vetting process for EMA was invoked "in connection with a procurement" under 28 U.S.C. § 1491(b)(1). See Distributed Solutions, Inc. v. United States, 539 F.3d 1340, 1346 (Fed. Cir. 2008) ("[T]he phrase, 'in connection with a procurement or proposed procurement,' by definition involves a connection with any stage of the federal contracting acquisition process . . . ."). However, as explained above, EMA has not established that the contracting officer violated the vendor vetting procedures. EMA was not entitled to the debriefing it seeks, because EMA was not an "apparent successful offeror" at the time that it was, or could have been, debriefed. Moreover, EMA has not demonstrated that even if it had been determined eligible for award under the vendor vetting process, the other independent grounds for its nonresponsibility determination were flawed. The Court therefore declines to remand the matter to the contracting officer with instructions to grant EMA a new debriefing.

## Conclusion

Defendant's Motion for Judgment on the Administrative Record is **GRANTED**. Plaintiff's Motion for Judgment on the Administrative Record and Permanent Injunction is **DENIED**. The Clerk of Court is directed to enter judgment accordingly. The parties and the classified information security officer shall propose redactions to this opinion by **September 28, 2012**.

                                          s/Mary Ellen Coster Williams
                                          **MARY ELLEN COSTER WILLIAMS**
                                          **Judge**